IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEON DRUMMOND, LEE WILLIAMS,     :
and YESHONDA DRIGGINS,           :
on behalf of themselves and all others :
similarly situated,              :
                                 :
                    Plaintiffs,  :          CIVIL ACTION NO. 21-4479
          v.                     :
                                 :
PROGRESSIVE SPECIALTY            :
INSURANCE COMPANY and            :
PROGRESSIVE ADVANCED             :
INSURANCE COMPANY,               :
                                 :
                    Defendants.  :

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                    August 11, 2023

This case involves a group of plaintiffs who allege that their automobile insurance company failed to pay them the actual cash value of their vehicles after said vehicles were deemed a total loss. The plaintiffs have filed a motion to certify a proposed class on behalf of similarly situated insureds, which the insurance company has opposed.

Between 2018 and 2021, each plaintiff used the insurance company to cover their respective vehicles for, among other things, total loss. Within that time period, each plaintiff filed a claim with the insurance company after suffering a vehicular accident. The insurance company declared each vehicle a total loss, at which time it had a contractual obligation to pay the plaintiffs the "actual cash value" of their vehicles. Nevertheless, the plaintiffs contend that they ultimately received less than actual cash value because the insurance company incorporated into its valuation process what are called "projected sold adjustments." Such adjustments are used to reflect consumer behavior such as price negotiation and often result in a deflation in calculated actual

cash value. According to the plaintiffs, though, such adjustments are premised upon outdated perceptions about the automobile market and should have therefore played no role in determining how much the insurance company owed the plaintiffs.

Based on these allegations, the plaintiffs brought this action against the insurance company claiming breach of contract. The plaintiffs have now motioned for class certification, proposing a class comprising similarly situated insureds who receive an amount below actual cash value decreased by the application of projected sold adjustments. The insurance company has opposed this motion, asserting that the plaintiffs have failed to meet certain requirements for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3). Moreover, the insurance company has filed three *Daubert* motions to exclude the reports and testimonies of various expert witnesses proffered by the plaintiffs, claiming that they do not meet the standard laid out in Federal Rule of Evidence 702. For the reasons laid out in this opinion, the court must grant the plaintiffs' motion and deny the insurance company's motions.

Beginning with the three *Daubert* motions, the court finds all relevant expert testimony to be qualified, reliable, and fit for the purposes of this case. Accordingly, their respective reports and testimonies are admissible. Turning next to the plaintiffs' motion for class certification, the court finds that the plaintiffs have satisfied all requirements. Specifically, the plaintiffs have demonstrated numerosity, commonality, typicality, and adequacy under Rule 23(a), predominance and superiority under Rule 23(b)(3), and Rule 23's implicit requirement of ascertainability. The court will accordingly grant the motion for class certification.

## I.    PROCEDURAL HISTORY

Plaintiffs Leon Drummond ("Drummond") and Lee Williams ("Williams") initiated this putative class action against Progressive Advanced Insurance Company and Progressive Specialty Insurance Company ("Progressive Advanced" and "Progressive Specialty"—or collectively

"Progressive") on October 12, 2021. *See* Compl., Doc. No. 1. In their original complaint, Drummond and Williams alleged that Progressive violated insurance contracts between the two plaintiffs and the company—as well as the insurance contracts of other insureds who experienced a total loss—by applying projected sold adjustments ("PSA") to artificially deflate the value of totaled vehicles and thereby pay insureds less than the contractually obligated actual cash value ("ACV") of said vehicles. *See id.* at ¶¶ 13–26.[1] Additionally, the complaint noted that Drummond and Williams would seek class certification to represent all persons who made a first-party claim on an insurance policy from Progressive where the payout was decreased after the application of a PSA. *See id.* at ¶¶ 27–35.

The complaint contained four causes of action. First, the complaint proposed that Drummond would lead a class asserting a breach-of-contract cause of action against Progressive Specialty (First Cause of Action) and Williams would lead a class asserting a breach-of-contract cause of action against Progressive Advanced (Second Cause of Action). *See id.* at ¶¶ 36–47. Moreover, both Drummond and Williams sought declaratory judgment (Third and Fourth Causes of Action). *See id.* at ¶¶ 48–59. On December 17, 2021, Progressive filed an answer, in which it denied that the use of PSAs constituted a breach of contract and asserted that the proposed class did not meet the requirements for class certification. *See* Doc. No. 16.

On June 14, 2022, the court consolidated this action with *Driggins v. Progressive Advanced Insurance Co.*, Civ. A. No. 22-1065.[2] *See* Doc. No. 39. Consequently, on June 29, 2022, Drummond and Williams filed with Yeshonda Driggins ("Driggins") an amended complaint, the

---

[1] The putative plaintiffs brought this action under the Class Action Fairness Act ("CAFA"). *See* 28 U.S.C. §§ 1332(d), 1453, 1711–15. Under CAFA, the court has jurisdiction over this action because the putative plaintiffs and Progressive are minimally diverse, the proposed class exceeds 100 persons, and the amount in controversy exceed $5 million in the aggregate. *See id.* § 1332(d)(2), (d)(5)(B).

[2] Under Federal Rule of Civil Procedure 42(a), courts may consolidate actions that "involve a common question of law or fact." Fed R. Civ. P. 42(a)(2).

operative complaint in this case. *See* Am. Compl., Doc. No. 43. The amended complaint contains

the same causes of action as the original complaint, except Driggins joins Williams in leading a

breach-of-contract cause of action and seeking declaratory judgment against Progressive

Advanced. *See id.* at ¶¶ 68–76, 83–88. On July 22, 2022, Progressive answered the amended

complaint, raising largely the same claims and arguments contained within its first answer. *See*

Doc. No. 51.

Drummond, Williams, and Driggins (collectively the "putative plaintiffs") filed a motion

for class certification on October 12, 2022, arguing that their proposed class meets the required

conditions for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3). *See*

Doc. No. 52. Progressive filed a response in opposition to class certification on November 21,

2022. *See* Doc. No. 56. On December 22, 2022, putative plaintiffs filed a reply in support of their

motion. *See* Doc. Nos. 66–67.

On January 18, 2023, Progressive filed *Daubert* motions to exclude the expert reports and

testimonies of Jeffery Martin ("Martin"), Jason Merritt ("Merritt"), Paul Mlinko ("Mlinko"), and

Kirk Felix ("Felix"). [3] *See* Doc. Nos. 71–72, 74–75. On February 8, 2023, the putative plaintiffs

filed motions in opposition to these *Daubert* challenges, arguing exclusion would be premature

and unjustified. *See* Doc. Nos. 82–87. Five days later, Progressive filed its replies in support of its

*Daubert* motions. *See* Doc. Nos. 88–91.

The court heard oral argument on both the putative plaintiffs' motion for class certification

and Progressive's *Daubert* motions on February 14, 2023. *See* Doc. No. 92. Accordingly, these

motions are now ripe for adjudication.

---

[3] A "*Daubert*" motion refer to the Supreme Court case *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579
(1993), which clarified the standard under which district courts are to assess the admissibility of expert witness
testimony.

## II.      FACTUAL ALLEGATIONS

The putative plaintiffs' allegations are as follows: Between 2018 and 2021, each putative plaintiff was involved in a car accident that resulted in physical damage to their respective vehicles. *See* Am. Compl. at ¶¶ 19–21. Moreover, each putative plaintiff held an insurance contract with Progressive at the time of their accident—Drummond through Progressive Specialty and Williams and Driggins through Progressive Advanced. *See id.* Following their accidents, the putative plaintiffs each filed a property damage claim with Progressive. *See id.* at ¶ 22. Progressive subsequently declared each vehicle a total loss and seemingly paid each putative plaintiff the ACV of their vehicle pursuant to Progressive's insurance policies. *See id.* at ¶ 23.

To calculate ACV, Progressive relies on a "total loss settlement process," which entails obtaining a "vehicle valuation report" from Mitchell International, Inc. ("Mitchell") and using the valuation to determine the ACV amount owed. *See id.* at ¶ 24. Crucial to this case, these valuation reports utilize PSAs to adjust ACV to "reflect consumer purchasing behavior," such as "negotiating a different price than the listed price." *See id.* at ¶ 26–27. In effect, these PSAs reduced the calculated ACV of the putative plaintiffs' vehicles by hundreds of dollars. *See id.* at ¶ 26.

The putative plaintiffs claim, however, that the PSAs used by Progressive to calculate ACV do not actually reflect the realities of the current vehicle market. *See id.* at ¶ 28. Indeed, according to the putative plaintiffs, the PSAs were premised upon a pre-online market in which dealerships priced vehicles above market value in anticipation of consumers negotiating prices down—the PSAs represented the anticipated drops in price following negotiation. *See id.* at ¶ 29. Yet, with the ubiquity of online shopping, the putative plaintiffs assert that dealerships no longer price vehicles above market value with the expectation of negotiation, meaning that there is no further need to use these PSAs to determine a vehicle's ACV. *See id.* at ¶¶ 30–32. Despite this, Progressive

continues to incorporate PSAs into its ACV calculations. *See id.* at ¶ 26. Even further, the putative plaintiffs allege that when calculating the PSAs, Progressive has excluded data on transactions in which the sold price of a vehicle equaled or exceeded its list price under the assumption that such transactions are anomalies. *See id.* at ¶¶ 35–38, 43–45.

The putative plaintiffs argue that Progressive's purportedly flawed methodology for calculating ACV has ultimately damaged many of its insureds who were not paid the true ACV of their vehicle due to the application of PSAs.[4] *See id.* at ¶¶ 53–54. Consequently, the putative plaintiffs are now seeking to certify the following classes of individuals:

**Progressive Advanced Class:**

All persons who made a first-party claim on a policy of insurance issued by Progressive Advanced Insurance Company to a Pennsylvania resident who, from October 12, 2017 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a "dual source" valuation report prepared by Mitchell (i.e. report type code = "DSCN") and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Progressive Specialty Class:**

All persons who made a first-party claim on a policy of insurance issued by Progressive Specialty Insurance Company to a Pennsylvania resident who, from October 12, 2017 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a "dual source" valuation report prepared by Mitchell (i.e. report type code = "DSCN") and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

Pls.' Mot. for Class Certification ("Pls.' Mot.") at 1, Doc. No. 52 (footnotes omitted). As noted above, Williams and Driggins are the proposed class representatives for the Progressive Advanced Class and Drummond is the proposed class representative for the Progressive Specialty Class. *See*

---

[4] Regarding the putative plaintiffs, Drummond's ACV payment would have allegedly been $520.42 higher but for the use of PSAs, Williams' $417.06 higher, and Driggins' $448.08 higher. *See* Am. Compl. at ¶ 54.

Am. Compl. at ¶ 56. The putative plaintiffs contend that they meet all prerequisites for class certification under Rule 23(a) and that class treatment is proper under Rule 23(b)(3).

## III.    DISCUSSION

### A.    *Daubert* Motions

Progressive has filed three *Daubert* motions to exclude the reports and testimonies of four of the putative plaintiffs' expert witnesses—Martin, Merritt, Mlinko, and Felix. In assessing *Daubert* motions at the class certification stage, the court must employ a two-step analysis: First, the court must determine whether the expert testimony proffered by the putative plaintiffs is "critical to class certification." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187–88 (3d Cir. 2015). At the outset, the court finds this to be so for each aforementioned witness. Thus, the court must next decide whether the expert testimony is admissible under Federal Rule of Evidence 702. *See Chen v. Amtrak*, No. 18-3617, 2019 WL 5294419, at *3 (E.D. Pa. Oct. 18, 2019). For the reasons discussed below, the court finds that each aforementioned witness indeed satisfies the requirements of Rule 702. Thus, the court must deny Progressive's *Daubert* motions.

### 1.    Standard of Review

District courts act as gatekeepers in assessing the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (discussing "the trial judge's general 'gatekeeping' obligation"). To admit such testimony, courts must find that an expert satisfies the requirements of Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 has "a liberal policy of admissibility." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 780 (3d Cir. 1996). The party proffering expert testimony has the burden of proving admissibility "by a preponderance of the evidence." *Pa. Trust Co. v. Dorel Juv. Grp., Inc.*, 851 F. Supp. 2d 831, 836 (E.D. Pa 2011) (citing *Daubert*, 509 U.S. at 592 n.10). Ultimately, Rule 702's requirements embody "a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

To be qualified, an expert witness must possess "specialized expertise" in the subject matter of their testimony. *Id.* at 404. "[W]itnesses . . . can qualify as experts under Rule 702 on the basis of practical experience alone." *Lauria v. Nat'l R.R. Passenger Corp.*, 145 F.3d 593, 599 (3d Cir. 1998). Indeed, Rule 702 does not "impos[e] overly rigorous requirements of expertise." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). Instead, a "broad range of knowledge, skills, and training qualify an expert as such." *Id.*

To be reliable, an expert witness must have "'good grounds' for his or her belief." *Id.* at 742 (quoting *Daubert*, 509 U.S. at 590). "Expert opinion need not possess the best foundation, or even . . . the best methodology . . . . Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology." *Utesch v. Lannett Co.*, No. 16-5932, 2021 WL 3560949, at *14 (E.D. Pa Aug. 12, 2021) (first omission in original) (internal quotation marks omitted) (quoting *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999)). "[T]he relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co.*, 526 U.S. at 150.

Accordingly, the party proffering an expert witness must only prove beyond a preponderance of the evidence that the witness's opinions are reliable, not that they are correct. *See Paoli*, 35 F.3d at 744 ("The evidentiary requirement of reliability is lower than the merits standard of correctness.").

To fit, a witness's testimony must be helpful to the trier of fact. *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 835 (3d Cir. 2020); *see also United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) ("'[F]it' is [primarily] a relevance concern."). "The standard is not that high, but is higher than bare relevance." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (internal quotation marks and citation omitted).

## 2.      Jeffrey Martin

Martin's report and testimony are admissible under Rule 702. For one, Martin is qualified to provide statistical analyses on the list and sold prices of vehicles. Indeed, Martin holds a master's degree in economics and has previously worked as a consultant on statistical issues. *See* Expert Report of Jeffrey Martin ("Martin Report") at ¶¶ 2–3, Doc. No. 56-27. Furthermore, he possesses specialized expertise in data analysis gained both through practical experience and education. *See id.* at ¶¶ 2–4.

Martin's report and testimony are also reliable. In his report, Martin analyzed data provided by third-party companies MarketCheck and Cross-Sell to calculate the ratio between used vehicles' list price and sold price. *See id.* at ¶¶ 15–17. Progressive primarily contends that the dataset upon which Martin performed his analyses is unreliable and unhelpful because the data representing the sold price of used vehicles may contain "add-ons," such as warranties and accessories that inaccurately reflect a used car's value. *See* Defs.' Mot. to Exclude the Report and Test. of Jeffrey Martin and Mem. in Supp. at 2, 10–11, Doc. No. 71. Nevertheless, considering

that the sold price data was provided to Cross-Sell by state DMVs, and that such data is commonly used in other commercial and academic industries for research and analytical purposes, *see* Martin Report at ¶ 16; Decl. of Jeremiah Kuntz ("Kuntz Decl.") at ¶¶ 7–9, Doc. No. 71-4, the data constitutes good grounds upon which Martin could perform his statistical analyses.

To further demonstrate the reliability of the Cross-Sell data, the putative plaintiffs have submitted a declaration from a former Texas DMV employee stating that Texas' sold price data, which is reported to Cross-Sell, reflects only the price the purchaser paid for the vehicle itself, excluding additional charges or fees paid at the point of sale. *See* Kuntz Decl. at ¶ 8. Martin also filed a supplemental report to address relevant concerns with the data he analyzed from Ohio, which did not materially change his conclusions. *See* Suppl. Decl. of Jeffrey Martin at ¶ 7, Doc. No. 71-3 (showing only slight changes in mean and median sold-to-list ratios). As an educated and experienced statistician, Martin applied reliable methodologies to extract various statistical metrics from the data, such as the median and mean sold-to-list price ratios of vehicles in three different states. *See* Martin Report at ¶¶ 31–51. The court therefore finds that the putative plaintiffs have proven beyond a preponderance of the evidence that Martin's report and testimony rest upon good grounds and are in turn reliable.

Finally, Martin's report and testimony fit this case since his data analysis will be helpful to a trier of fact. Martin's analysis of list and sold price data is relevant to determining the ACV of used cars, a key issue in this case. Though he does not analyze data from Pennsylvania, Martin's testimony sheds light on the national used car market, which will aid a trier of fact in evaluating the suitability of PSAs. Ultimately, many of Progressive's contentions go to the weight of Martin's testimony. Since Rule 702 embodies a strong preference for expert opinions to be tested by the adversarial process, *TMI*, 193 F.3d at 692 ("So long as the expert's testimony rests upon 'good

grounds,' it should be tested by the adversary process . . . rather than excluded from juror's scrutiny . . . ." (citation omitted)), Progressive's motion to exclude Martin's report and testimony must be denied.

### 3.      Jason Merritt

Merritt's report and testimony are also admissible. To start, Merritt is qualified as an expert to opine on how cars are typically appraised. He has gained specialized expertise in this field from his experience conducting over 1,000 appraisals over his career, becoming a member of the Bureau of Certified Auto Appraisers, and working for companies that perform appraisals both as an employee and as an owner. *See* Rule 26(a) Expert Report of Jason Merritt ("Merritt Report") at 1, Doc. No. 56-25.

Furthermore, Merritt's report and testimony are reliable. His extensive practical experience as an appraiser constitute good grounds upon which he is permitted to base his testimony. *See Lauria*, 145 F.3d at 599 ("To be 'specialized,' knowledge can be based on sufficient practical or work experience in the field about which the witness is testifying . . . ."). His report details the "comp" methodology for appraisals, which compares the list price of similar vehicles in a geographical area to project a vehicle's ACV. *See* Merritt Report at 2–3. The "comp" methodology is a widely accepted appraisal method in the auto industry. *See id.* Merritt concludes that although Mitchell produces appraisal values consistent with the "comp" methodology, the application of PSAs is inconsistent with industry standards. *See id.* at 4–6. To demonstrate this, Merritt relies upon his extensive experience in conducting appraisals, even going so far as to show how he would have appraised the putative plaintiffs' respective vehicles. *See id.* at 6–9.

Finally, Merritt's report and testimony fit this case and will be helpful to a trier of fact. Specifically, Merritt offers insight into a generally accepted methodology of valuating used

vehicles; his explanation and application of the "comp" methodology will help a factfinder determine whether it is appropriate to apply a PSA while appraising a used vehicle. Accordingly, Progressive's motion to exclude Merritt's report and testimony must be denied.

### 4.    Paul Mlinko & Kirk Felix

Lastly, both Mlinko's and Felix's reports and testimonies are admissible. For one, both are qualified to testify as experts on how the used car industry prices and sells cars. Mlinko has worked in the used car industry for nearly 30 years and currently manages a Pennsylvania car dealership. *See* Expert Report of Paul Mlinko ("Mlinko Report") at 1, Doc. No. 56-23. He has experience selling and pricing cars and has worked closely with various vehicle valuation programs throughout his career. *See id*. Likewise, Felix has worked in the used car industry for over three decades. *See* Expert Report of Kirk Felix ("Felix Report") at 1, Doc. No. 56-21. For most of his career, he has worked as a consultant with over 300 used car dealerships to ensure profitability and efficient operating procedures. *See id.* He has furthermore studied and assisted dealerships in conforming to shifting industry trends and has experience dealing with common vehicle pricing software such as "V-Auto." *See id.* Both witnesses' considerable practical experience in the used car industry qualifies them as experts.

Mlinko's and Felix's respective reports and testimonies are also reliable. Both witnesses base their opinions on their own experience and personal knowledge, which may be the foundation for reliable expert testimony. *See Kumho Tire Co.*, 526 U.S. at 150 ("[T]he relevant reliability concerns may focus upon personal knowledge or experience."). For example, Felix opined that PSAs are improper since dealers are generally unwilling to negotiate down on price in cash transactions. *See* Felix Report at 2–5 ("Mitchell and Progressive assume that car dealers . . . advertise the vehicles above that market price . . . . For the reasons I already explained, that just is

not true."). To reach this opinion, Felix applied the knowledge he gained while working with over 300 dealerships throughout his career and witnessing the internet provide consumers with a transparent market, forcing dealers to list cars at their market value. *See id.* at 1, 5–10. Mlinko reached similar conclusions by drawing from his own unique perspective and experience in the industry. *See* Mlinko Report at 1. Specifically, Mlinko contrasted his time selling cars in the 1990s, which had abundant consumer negotiation, to today, where he prices cars according to their market value. *See id.* at 1–4. Mlinko's and Felix's respective reports and testimonies are thus reliable since both witnesses detail how their opinions are supported by their experience.

Finally, Mlinko's and Felix's respective reports and testimonies fit this case and will be helpful to a trier of fact. Each witness addresses whether list price is an accurate representation of a used vehicle's ACV. Both also assert that dealerships typically list vehicles at market value, shedding light on the significance of list price in determining a vehicle's ACV. *See id.* at 2; Felix Report at 2–4. They compare Progressive's methods to industry practices with which they are familiar, which can help a trier of fact gain clarification regarding essential aspects of the case. *See* Mlinko Report at 4; Felix Report at 4–5. Progressive's motion to exclude the reports and testimonies of Mlinko and Felix must accordingly be denied.

### B.    Motion for Class Certification

As described above, the putative plaintiffs have moved for class certification, contending that they meet the requirements of Rules 23(a) and 23(b)(3). *See* Pls.' Mot. at 1. Progressive opposes this motion, arguing that the putative plaintiffs meet neither the commonality and adequacy requirements of Rule 23(a) nor the predominance and superiority requirements of Rule 23(b)(3).[5] *See* Defs.' Resp. in Opp'n to Pls.' Mot. for Class Certification. ("Defs.' Opp'n") at 18,

---

[5] Progressive does not seem to challenge class certification based on Rule 23's implicit requirement of ascertainability. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592–93 (3d Cir. 2012) (calling ascertainability an "essential

Doc. No. 56. After careful consideration, the court finds that the putative plaintiffs meet the requirements for class certification. Accordingly, the court must grant their motion.

### 1.     Standard of Review

The party seeking class certification must demonstrate that all requirements of Rule 23(a) and at least one requirement of Rule 23(b) are satisfied. Under Rule 23(a),

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> **(1)** the class is so numerous that joinder of all members is impracticable;
> **(2)** there are questions of law or fact common to the class;
> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> **(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Under Rule 23(b)(3)—the Rule 23(b) requirement under which the putative plaintiffs seek class certification—"the court [must] find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b)(3).

Assessing the putative plaintiffs' request for class certification requires the court to undertake a "rigorous analysis." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Such analysis

---

prerequisite" to class certification). Nor does Progressive challenge class certification based on Rule 23(a)'s explicit requirements of numerosity and typicality. *See* Fed. R. Civ. P. 23(a)(1), (a)(3).

    Even if Progressive had challenged these requirements, the court would still find in the putative plaintiffs' favor. For one, the class is ascertainable because it is "defined with reference to objective criteria" and its potential members can be identified using Progressive's records. *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). Additionally, the class meets the numerosity requirement because it totals over 40 members. *See Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001) (stating that numerosity is satisfied if "the potential number of plaintiffs exceeds 40"). Finally, the putative plaintiffs are typical because they raise a breach-of-contract claim that applies to all Progressive insureds within the class—there is no suggestion that they have any unique circumstances or plan to raise individualized defenses that will become a "focus of the litigation" or that their interests are not "aligned" with other members of the class. *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

requires that "[f]actual determinations . . . be made by a preponderance of the evidence." *Id.* at 307. The court "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action."[6] *Id.* In turn, the court must find "[a]ctual, not presumed, conformance with the Rule 23 requirements." *Id.* at 326 (internal quotation marks omitted) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)).

### 2.      Analysis

Progressive raises three objections to class certification. First, it claims that the individualized nature of calculating ACV prevents certification under the commonality and predominance requirements. *See* Defs.' Opp'n at 18–36. Second, it argues that class treatment is inferior because this class action would require mini-trials to determine each class members' ACV and class members had other options to challenge their ACV, such as a cost-effective appraisal clause. *See id.* at 36–37. Finally, it contends that the putative plaintiffs are inadequate class representatives because they have waived claims based on other aspects of Progressive's valuation process and the proposed damages calculation creates an intraclass divide. *See id.* at 37–39. Ultimately, as discussed below, the court is not persuaded by these arguments.

#### a.      Rule 23(a)(2)—Commonality

The putative plaintiffs satisfy the commonality requirement under Rule 23(a)(2). Commonality is met if the questions and class are shaped in such a way that the proceedings can produce common answers. *See Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019) ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to

---

[6] This obligation "extends to expert testimony, whether offered by a party seeking class certification or by a party opposing it." *Hydrogen Peroxide*, 552 F.3d at 307.

drive the resolution of the litigation." (omission in original) (citation omitted)); *see also Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011) (holding that claims must be based on "common contention" where "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"). Here, the putative plaintiffs have framed their breach-of-contract question in a manner that is able to produce "common answers" about a class-wide injury.

Progressive asserts that its obligation to pay insureds the ACV of their totaled vehicles does not extend to using a specific methodology to calculate it. *See* Defs.' Opp'n at 19. In Progressive's view, a breach only occurs if an insured is paid less than ACV. *See id.* Therefore, to determine if there were a breach, Progressive argues that the court would need to decide if *each person* was paid less than their ACV because of the application of PSAs. *See id.* at 20. Progressive maintains that such an inquiry would be highly individualized and thus undermine Rule 23(a)'s commonality requirement. *See id.* Furthermore, Progressive claims that the putative plaintiffs would need to show that the PSA was inaccurate in each instance. *See id.* In Progressive's view, this would require the putative plaintiffs to show that each comparable vehicle used to calculate ACV was later sold for more than projected. *See id.* According to Progressive, this means that the class proceeding could not "generate common answers." *Ferreras*, 946 F.3d at 185 (emphasis omitted).

The court disagrees with these assertions. As an action for breach of contract, the case turns generally on whether Progressive's use of PSAs violated its contractual obligation to pay the proposed class members the ACV of their vehicles. Thus, the common answer is quite clear: the use of PSAs either did or did not violate the contract. The legitimacy of PSAs as a means of calculating ACV is in turn a "question[] . . . common to the class." Fed. R. Civ. P. 23(a)(2). And while the court acknowledges that the class members might not have identical claims sharing

identical facts, that is not enough to defeat commonality. *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Rather, the proposed class satisfies Rule 23(a)(2) so long as the putative plaintiffs demonstrate that all class members have been "subject[ed] to the same harm." *Id.* (emphasis omitted). Here, all potential class members have received compensation from Progressive calculated in part through the application of PSAs. *See, e.g.*, Defs.' Opp'n, Ex. C, Vehicle Valuation Report at 9, Doc. No. 56-3 (including "Projected Sold Adjustment" in overview of vehicle valuation). Class-wide litigation could therefore generate common answers about whether Progressive breached its contract with the proposed class members.

> b.    Rule 23(a)(4)—Adequacy

The putative plaintiffs also satisfy the adequacy requirement under Rule 23(a)(4). To do so, plaintiffs and their counsel must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing adequacy, the court must consider the "interests and incentives of the representative plaintiffs" and the "experience and performance of class counsel." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012). For representative plaintiffs, "the linchpin of the adequacy requirement is the alignment of interests and incentives between the[m] . . . and the rest of the class." *Id.* at 183.

Here, Progressive argues that the putative plaintiffs are inadequate because they have waived all claims about Progressive's valuation process except those that challenge the application of PSAs. *See* Defs.' Opp'n at 37–38. Additionally, Progressive argues that the putative plaintiffs' damages calculation and model could create an intraclass divide. *See id.* at 38–39. While the putative plaintiffs have waived any non-PSA-related claims, this action is pursued under Rule 23(b)(3), which, critically, gives potential class members an opportunity to opt out. Courts have found this instrumental in finding adequacy. *See, e.g.*, *Gates v. Rohm & Haas Co*., 265 F.R.D. 208,

218 (E.D. Pa. 2010) (noting an opt-out mechanism as important in ruling on adequacy challenges to grant class certification). In a similar challenge to Progressive's use of PSAs, another court found the adequacy requirement satisfied despite the existence of waived claims, stating that "the marginal value of any waived claims appears to be relatively low, while the strategic value of pursuing claims on behalf of a . . . class is substantial." *Volino v. Progressive Cas. Ins. Co.*, Nos. 21 Civ. 6243 & 22 Civ. 1714, 2023 WL 2532836, at *11 (S.D.N.Y. Mar. 16, 2023) (omission in original) (internal quotation marks and citation omitted). This court finds the same.

Turning next to Progressive's second challenge to adequacy, the court does not find that the damages calculation creates enough of an intraclass conflict to justify denying class certification. "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Dewey*, 681 F.3d at 184 (alteration in original) (citation omitted). For a conflict between the representative plaintiffs and class members to be so fundamental that it defeats adequacy, said conflict must "touch the specific issues in controversy." *Id.* (internal quotation marks and citation omitted). Progressive argues that because some cars still sell below listing price and because some class members may have received less money under other valuation methods, the putative plaintiffs' damages calculations— returning each class member half their averaged PSA—would overcompensate many class members. *See* Defs.' Opp'n at 38–39. Nevertheless, while this could constitute a conflict to some degree, the court does not find it concretely fundamental. For one, the court cannot at this time ascertain whether, and to what extent, any potential class members may have benefited from Progressive's application of PSAs and consequently have conflicting interests from the class members that were harmed by Progressive's conduct. *See Dewey*, 681 F.3d at 184 ("A conflict that is unduly speculative . . . is generally not fundamental."). Additionally, regarding other valuation

methods such as the National Automobile Dealers Association Official Used Car Guide, it is irrelevant to this case whether the putative plaintiffs would have received less money through the application of such methods. The focus of this challenge is whether the application of PSAs to Mitchell's WorkCenter Total Loss ("WCTL") valuation violated Progressive's contractual obligation to pay ACV; the fact that other valuation methods may have provided the putative plaintiffs with even less money does not automatically negate their challenge. Put more plainly, it is possible for Progressive to have paid the putative plaintiffs more than they would have if applying an alternative valuation method yet still have failed to pay the ACV of the putative plaintiffs' vehicles. Overall, the court finds adequacy met here.

c.      Rule 23(b)(3)—Predominance & Superiority

The putative plaintiffs satisfy the predominance and superiority requirements under Rule 23(b)(3). Predominance mandates "questions of law or fact common to class members [to] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Particularly, predominance asks "whether the defendant's conduct was common as to all of the class members, not . . . whether each plaintiff has a 'colorable' claim." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 299 (3d Cir. 2011). The putative plaintiffs must show that "the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 552 F.3d at 311–12. In ruling, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Id.* at 311 (quoting *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)). Such an analysis begins "with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

19

Regarding superiority, Rule 23(b)(3) requires the court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The matters pertinent" to finding predominance and superiority include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> **(D)** the likely difficulties in managing a class action.

*Id.* For the below reasons, the court finds both Rule 23(b)(3) requirements met in this case.

### i.   Predominance

To begin, Progressive argues that to establish a breach, the putative plaintiffs must show that they received less than the ACV of their vehicles, which itself requires presenting and comparing alternate valuations and assessing "whether each comparable vehicle to which a PSA was applied ultimately sold for more or less than the price WCTL projected." Defs.' Opp'n at 22. Progressive claims that in the absence of such evidence, there exists no common evidence that the PSAs used by Progressive were inaccurate. *See id.* at 22–24. Progressive adds that determining ACV is an individualized inquiry based on factors specific to each vehicle and that the putative plaintiffs had the ability to negotiate higher settlements. *See id.* at 24–28. In support, they point to cases in which other courts have denied class certification based on allegedly similar concerns. *See id.* at 28–31.

Progressive's argument, however, misunderstands the putative plaintiffs' core claim. The putative plaintiffs do not challenge the price for which PSAs predict each car will sell; rather, they challenge the application of PSAs altogether. The putative plaintiffs' argument, properly understood, is that ACV should not be calculated based on projected sale prices, which is what

applying PSAs does. Progressive maintains that PSAs are legitimate. The putative plaintiffs maintain they are inaccurate because they misrepresent current market behavior. It is this dispute, not the individual projected sale price of each vehicle, that is at the center of this action.

Likewise, unlike the cases to which Progressive cites in which class certifications were denied, this action is tailored to only challenge PSAs under a breach-of-contract theory. Progressive cites several cases in which plaintiffs challenged totaled vehicle valuations based on state law theories or the overall valuation report. *See Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1136 (9th Cir. 2022) (upholding denial of class certification in which plaintiffs did not plan to show that they received less than ACV)); *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 577 (8th Cir. 2017) (decertifying class in property insurance action in which insurance contract paid only ACV of damaged property and would not pay cost of repairs until repairs were complete because common questions did not predominate); *Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, No. C20-454, 2022 WL 1404526, *2 (W.D. Wash. May 4, 2022) (denying class certification for challenge to State Farm's application of "typical negotiation discount" because there was no evidence of injuries or damages to meet the standard set by *Lara*).  Here, only the application of PSAs is challenged; the putative plaintiffs take no issue with the valuation report beyond the PSA reduction. The evidence used to determine if PSAs are accurate is common to the class because it relies on common testimony about car sales, *see* Pls.' Reply in Supp. of Their Mot. for Class Certification ("Pls.' Reply") at 5, Doc. No. 66, which highlights the predominance of the core claim here. The above-cited cases are therefore distinguishable and immaterial to the court's finding of predominance.

The court equally finds unpersuasive Progressive's argument that there is no predominance because the potential class members had the ability to negotiate settlements. *See* Defs.' Opp'n at

27–28. While insureds were able to negotiate settlements with Progressive, none of these negotiations appear to have resulted in Progressive not applying PSAs. *See* Pls.' Reply at 9 (citing deposition of Jonathan Walker). Additionally, the proposed class is limited to those whose "actual cash value was decreased based upon Projected Sold Adjustments," *see supra* at p. 6, meaning anyone who successfully negotiated away the application of PSAs would not be included in the class.

Progressive also contends that, without performing individualized inquiries, there is no predominance because the putative plaintiffs cannot show that the alleged breach of contract resulted in an actual injury in fact, a necessary component for both a Pennsylvania breach-of-contract claim and Article III standing. *See* Defs' Opp'n at 32–34; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (stating that plaintiff must have suffered "injury in fact" to have standing); *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (listing "resultant damages" as element of breach of contract). For a court to grant class certification, each member of the proposed class must have Article III standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Thus, if no injury in fact were to exist here, the court could not grant the putative plaintiffs' motion. Nevertheless, like Progressive's other challenges to predominance, this argument is unpersuasive because this action ultimately centers on the use of PSAs to devalue the class member's ACV: The injury is the devaluation resulting from the application of PSAs, which allegedly breaches the contract between Progressive and its insureds.

Such a breach would certainly be enough to entitle the class members "at least to nominal damages" under Pennsylvania law, thus satisfying that state-law element. *Scobell Inc. v. Schade*, 688 A.2d 715, 719 (Pa. Super. 1997) (quoting *Aiken Indus., Inc. v. Estate of Wilson*, 383 A.2d 808, 812 (Pa. 1978) (plurality opinion)). Furthermore, regarding Article III standing, the class members

have been potentially "denied the benefit of [their] bargain," which constitutes an injury in fact. *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018) ("Like any private contract claim, [their] injur[ies] do[] not depend on allegation of financial loss."). Specifically, the alleged breach of contract is concrete, particularized, and actual because, if the putative plaintiffs are correct about PSAs, potential class members did not receive the ACV of their vehicles as Progressive was contractually obligated to pay. *See Lujan*, 504 U.S. at 560 (holding that injury in fact requires "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" (internal quotation marks and citations omitted)).

Finally, Progressive claims that the damages calculation is more complex than simply removing PSAs from the valuation of ACV. *See* Defs.' Opp'n at 35–36. However, the damages calculation, while contested, does not change the predominance of common issues enough to justify denying class certification. *See Volino,* 2023 WL 2532836, at *11 ("Even if Plaintiffs' methodology does not capture every nuance of Progressive's formula, that would not invalidate the model for purposes of class certification."); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016) (holding that damages need not be "susceptible of measurement across the entire class for purposes of Rule 23(b)(3)" (quoting *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015)). Accordingly, Rule 23(b)(3)'s predominance requirement is met.

### ii.    Superiority

Progressive argues that superiority is not satisfied because certification would lead to "thousands of mini trials." Defs.' Opp'n at 36–37. Progressive also notes that the putative plaintiffs have contractual options, such as a cost-effective appraisal clause, that they could pursue instead of litigation. *See id.* at 37. The facts here, however, support a finding of superiority. For one, the

potential for recovery on each individual claim is small, at most a few hundred dollars. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616 (1997) ("[T]he interest [in individually controlling litigation] may be no more than theoretic where the individual stake is so small as to make a separate action impracticable." (citation omitted)); *Volino*, 2023 WL 2532836, at *11, ("[A] class action is superior where potential class members are aggrieved by the same policies and the damages suffered are small relative to the expense and burden of individual litigation." (alteration in original) (citation omitted)). Additionally, no individualized defenses have been raised and the same legal theory—breach of contract—governs each claim. Taken together, no potential class member has a compelling interest in "individually controlling" the litigation. Fed. R. Civ. P. 23(b)(3)(A). Neither the motion, response, nor reply mention other litigation about Progressive's use of PSAs in the Eastern District of Pennsylvania. *See id.* 23(b)(3)(B). Given the commonality and predominance findings, concentrating the litigation in one court as a class action would likely lead to a consistent and efficient outcome. *See id.* 23(b)(3)(C). Finally, neither side has noted any "difficulties in managing [this] class." *Id.* 23(b)(3)(D). The court therefore finds that class treatment is superior.

*   *   *

Overall, the court is unpersuaded by Progressive's arguments that commonality, adequacy, predominance, and superiority are not present here. To the contrary, the court finds that the putative plaintiffs have met their burden under Rules 23(a) and 23(b)(3). Consequently, the court must grant their motion for class certification.

## IV.    CONCLUSION

For the aforementioned reasons, the court will deny Progressive's motions to exclude the

reports and testimonies of Martin, Merritt, Mlinko, and Felix. At the same time, the court will grant

the putative plaintiffs' motion for class certification.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.